154 P.2d 238

**TIETZEL v. SOUTHWESTERN CONST. CO.**

No. 4740.

Supreme Court of New Mexico.

Nov. 29, 1944.

Frank O. Westerfield, of Albuquerque, for appellant.

John F. Simms, Hugh B. Woodward, and Lawson K. Stiff, all of Albuquerque, for appellee.

SADLER, Chief Justice.

This appeal marks the second appearance of this case in our court. See Tietzel v. Southwestern Construction Company, 43 N.M. 435, 94 P.2d 972, 126 A.L.R. 307. We reversed the decree of the District Court of Bernalillo County on that appeal for error in making an order of reference over the plaintiff's objection. The cause was remanded with the direction to award a new trial. It is from the decree entered following a new trial that the present appeal is prosecuted.

In his complaint the plaintiff, Tietzel, sought to quiet title to real estate located in the following additions to the City of Albuquerque, to-wit:

"All of Blocks 9, 10, 11, 12, 13 and 14 of the Sulzer Addition; Blocks 11, 12 and 13 of the Angelo Viviani Addition, hereinafter referred to as the Viviani Addition; and certain described lots in Blocks 5 and 9 of the Rodey and Bratina Addition."

The real estate located in the Rodey and Bratina Addition is removed from consideration through defendant's disclaimer of title to any parcels of land in said addition described in the complaint.

The defendant interposed an answer of general denial and by cross-complaint asserted title in itself to the premises involved in the Sulzer and Viviani Additions, limiting its claim at the trial, however, to an undivided one-half interest only in the property located in the Sulzer Addition.

A new trial was had and the court entered its decree quieting title in plaintiff to all the lots in the Rodey and Bratina Addition, to which title was asserted in the complaint, and to an undivided one-half interest in the property involved in the Sulzer Addition. The decree quieted title in defendant to an undivided one-half interest in the property located in the Sulzer Addition and as well to the entire interest in all the described property located in the Viviani Addition. The plaintiff appeals, complaining of so much of the decree as quiets title in defendant to an undivided one-half interest in the land in the Sulzer Addition and to the entire interest in the area located in the Viviani Addition and complaining also insofar as the decree fails to quiet title in him to the entire interest in both properties.

The Viviani and Sulzer Additions as platted are parts of two narrow strips of land $62\frac{1}{2}$ varas in width north and south, extending from the floor of the Valley of the Rio Grande River east toward the mountains, a distance variously estimated from one to one and one-half miles. Originally the two narrow strips were in one tract 125 varas in width from north to south. The strip from which the Viviani Addition was platted adjoins on the north the strip from which the Sulzer Addition was platted and parallels it from east to west. So far as the record discloses, the earliest muniment of title embracing both of these narrow strips appears as Entry No. 27 in an original abstract containing some two hundred fifty entries, certified to us by the district judge for inspection along with certain other original exhibits, among

them, four plats or blue prints of varying size and extent. The deed at Entry No. 27 of the abstract discloses a conveyance on June 7, 1823, by Juan Armijo Alferes, Constitutional Alcalde, to Juan Antonio Gallegos of a strip 150 varas wide embracing the two strips 62½ varas in width described above. As shown by the next entry, No. 28, some forty-four years later, April 8, 1864, one Juan Gallegos, as grantor, conveyed 125 varas of this land, being the two strips 62½ varas wide mentioned above, to one Nepomuseno Lopez and to one Maria Manuela Lopez, father and daughter, respectively, the grantees taking as tenants in common.

We have cited this origin of the Lopez title under which both parties claim as to the disputed area in the Sulzer Addition and the basis of one of defendant's claims to the disputed area in the Viviani Addition, to afford a better understanding of their respective contentions. Without now conceding the correctness of defendant's assertions as to what the proof shows the state of the title to be, we select the following passages from its brief as the best exposé of their respective claims found in the brief of either party, to-wit:

"The plaintiff claims a superior title to the real estate within the south half of the Lopez strip to-wit: the lots in the Sulzer Addition under title tracing back to a deed executed by Nepomuseno Lopez, in which deed his co-tenant, Maria Manuela Lopez, did not join.

"The defendant claims title by virtue of a deed executed by the heirs at law of Nepomuseno Lopez and Maria Manuela Lopez.

"As to the lots and blocks in the Angelo Viviani Addition, plaintiff chooses to ignore the Lopez title and founds his claim on a chain emanating from the heirs of Telesforo Martinez. The first muniment in this chain is the will of Telesforo Martinez, shown by plaintiff's Exhibit G, at page 2 (abstract), which will was presented for probate March 19, 1880. By deed from the heirs of Telesforo Martinez there was conveyed to plaintiff's predecessors in title their interest in that strip of land platted as the Angelo Viviani Addition, which is identified as the north half of the Nepomuseno Lopez and Maria Manuela Lopez strip; these deeds to Viviani and his predecessors define the eastern boundary of such tract as 'the foothills' or 'the hills.'

"Defendant, through its predecessors in title, also claims under the Martinez chain of title that area of the same strip bounded on the west by the 'summit of the foothills' and on the east by the Albuquerque Grant line. The City of Albuquerque, designated by the act of Congress as trustee for the owners of real estate within the grant boundaries, has always recognized the titles to these various strips of land as extending to the grant line.

"In other words, defendant claims title to an undivided one-half interest in the

Sulzer strip, and to all of the land in the Angelo Viviani Addition under the Lopez chain of title. The defendant also claims a superior title under the Martinez chain to that portion of the disputed area in the Angelo Viviani Addition strip which is bounded on the west by the 'summit of the foothills.'"

We shall first consider the claims of the respective parties to the disputed areas lying within the Sulzer Addition. As to plaintiff's claim on this area, laying aside for the present his reliance on title by adverse possession, he admittedly rests such claim to the whole interest upon a deed to a predecessor in title signed by one only of two co-tenants, each owning an undivided one-half interest. Nepomuseno Lopez and his daughter, Maria Manuela Lopez, by deed in 1864 acquired the 125-vara strip embracing both the lands in the Viviani and the Sulzer Additions. In 1887 Nepomuseno Lopez *alone* conveyed the south 62½ varas from which the Sulzer Addition was subsequently platted to Meliton Chavez, from whom the same passes by mesne conveyance to one J. F. Sulzer, who gave the Addition his name when he platted it. The plaintiff accepted a conveyance from Sulzer to the blocks in controversy in the Sulzer Addition.

As between the plaintiff and the defendant it must be obvious, passing the question of adverse possession, that if defendant shows itself vested with the title of Maria Manuela Lopez, it is the owner of an undivided one-half interest in the disputed

areas located in the south half of this 125-vara strip.

Maria Manuela Lopez had been dead for many years at the time the plaintiff instituted this suit to quiet title. He joined as defendants "The unknown heirs of Maria Manuela Lopez, deceased." The trial court's Finding No. 31 is as follows:

"That Maria Manuela Lopez was the daughter of Juan Nepomuseno Lopez, who, upon his death, left him surviving as his sole heirs, the heirs at law of Maria Manuela Lopez. That the sole surviving heirs at law of Maria Manuela Lopez and Juan Nepomuseno Lopez, at the time of trial, were: Toribio Gutierrez, Olegio Torres, Carslota G. de Apodaca, and Telesfor Gutierrez, grantors in the deed, 'Defendant's Exhibit 1', which grantors were made defendants in the instant cause by the plaintiff under the designation 'the unknown heirs of Maria Manuela Lopez, deceased, and the unknown heirs of Nepomuseno Lopez.' " (Tr.36.)

The conclusion thus seems inescapable that the defendant is vested with an undivided one-half interest in the disputed area lying within the Sulzer Addition, as found and held by the trial court unless, when defendant took under a deed from the heirs of Maria Manuela Lopez, the interest of such heirs already had been divested or they then were or defendant later became barred and estopped from asserting same. These are matters to be determined subsequently upon a review of certain findings of the trial court and its

conclusion that plaintiff's reliance on adverse possession or limitations was not sustained.

We turn next to a consideration of the issues raised by the conflicting claims of the parties under the Martinez chain of title. Insofar as the issues under this chain are concerned, they relate only to such portion of the north half of the above mentioned 125-vara strip as lies within the Viviani Addition. The circumstance that both the plaintiff and the defendant claim under the Martinez chain of title arises on adverse or inconsistent deeds given to the predecessors in title of each party by persons purporting to be, in plaintiff's case, the heirs and devisees of Telesforo Martinez and, in defendant's case, the surviving heirs of Telesforo Martinez. On February 17, 1879, one Telesforo Martinez made a last will and testament devising his real estate "to the family of Quirina Aragon." She died at some time between that date and May 20, 1880, when her last will was "approved" by the Probate Judge of Bernalillo County. The inventory on her estate listed as property belonging to her "one land situated in El Llano of Albuquerque from the Estero to the Hills, value $30.00, and other land." From Quirina Aragon there passed by mesne conveyances to Angelo Viviani whatever title she had to the tract of land comprising the north half of the above-mentioned 125-vara strip under a description as follows:

"Bounded on the south by the land of Nepomuseno Lopez, on the north by lands of Francisco Griego, on the east by the range of hills lying east of the plaza of Albuquerque, and on the west by an arroyo."

On February 28, 1898, Angelo Viviani platted and dedicated from this land what is now known as the Angelo Viviani Addition to the City of Albuquerque. It should also be stated that, intervening between the deed from Quirina Aragon (ostensibly devisee of Telesforo Martinez) to one of Viviani's predecessors in title and the platting of the Viviani Addition, he or his predecessors in title received deeds to the north half of this 125-vara strip of land from various heirs at law of Telesforo Martinez. In deeds constituting the chain of title running into Angelo Viviani prior to dedication, this strip is variously described as bounded on the east by the "hills," "the foothills," "the sandhills" and "the sandhills or foothills".

The defendant's claim under the Martinez chain of title appears to have originated in a deed from certain of the heirs of Telesforo Martinez dated January 24, 1894 (appearing as Entry No. 138 of Abstract), under a description as follows:

"Bounded on the north by lands of said parties of the second part, Edward Dodd and Charles Zeiger, conveyed to them by Charles Kemp and wife, on the east by the eastern line of the Abuquerque Grant, on the south by lands known as the Rodey and Bratina tract, conveyed to said Rodey and Bratina by Mateo *Sures,* and on the west by the summit of the foothills".

It is to be noted that the eastern boundary of the tract as described in the foregoing deed is given as the "eastern line of the Albuquerque Grant," rather than as "hills", "the sandhills" or "the foothills," which is the eastern boundary as described in deeds constituting the chain of title out of Telesforo Martinez into Angelo Viviani and thence into plaintiff. It is also to be noted that this deed does not convey land running the entire distance east and west of said strip in that the western boundary is given as the "summit of the foothills", rather than as the "Estero." Furthermore, the description of the property under the Zeiger-Dodd-Trimble branch of the Martinez chain of title undergoes an additional change in the western boundary in the deed to defendant's immediate grantor (appearing at page 173 of Abstract), in that the western boundary is changed from "summit of the foothills" to "east line of High Street."

It thus appears that in certain deeds relied upon by plaintiff in the Martinez chain of title the eastern boundary of the 62½-vara tract from which the Viviani Addition was platted is variously described as "the hills", "the foothills" or "the sandhills", whereas conveyances to defendant's predecessors in title under the Martinez chain (the Zeiger-Dodd-Trimble branch) describe the western boundary of the tract as "the summit of the foothills." Expert testimony of Mr. C. B. Beyer, of the Ross Engineering Company, was received. He stated he had had twenty-five years' experience in surveying and running out lines under old Spanish deeds in the Rio Grande Valley; that over this period he had also talked with many of the native people and from this experience and these conversations he was able to state that the use in conveyances of a call "to the foothills" or "to the sandhills" was generally understood and recognized as meaning to the *bottom* of the foothills. The trial court found touching this matter as follows:

"1. That a custom existed among the Spanish settlers of the Rio Grande Valley and their descendants in conveyancing of valley lands to designate as a terminal boundary line 'the foothills', or 'the sandhills'.

"2. That, by custom, it was generally understood and recognized by the parties to said conveyances that the call to the foothills or to the sand hills meant to the bottom of the foothills or sand hills."

If the proof had shown these calls running in the same direction, as for instance in plaintiff's deeds "bounded on the east by the foothills" and in defendant's deeds "bounded on the east by the summit of the foothills," we should understand the significance of the controversy which raged below over the matter. But we frankly confess our inability to do so when we recognize that "to the foothills" marks an eastern boundary for the plaintiff and "to the summit of the foothills" delimits the defendant's boundary on the west. If both calls ran from west to east and were from common grantors, very naturally and logically the overlap between the "foot"

of the foothills and the "summit" of the foothills would vest in defendant a superior title to the area of the over-lap under this chain of title. But the calls coming from opposite directions, even if from common grantors, not only would fail to create conflict but would leave the intervening area between the foot of the foothills and the summit thereof not covered by the deeds of either party.

We might have left unsaid our comment upon the contentions of the respective parties concerning the Martinez chain of title in view of our conclusion and apparently that of the trial court that it cannot be recognized but for the fact that so much of the time of court and counsel below was given over to a consideration of various phases of it. As indicated, however, we see only color of title in the Martinez chain of title—nothing more. True, its origin is the last will and testament of one Telesforo Martinez, dated February 17, 1879. But if the testator had any title, so far as the abstract and record before us disclose, he created title in himself by presuming to devise it. Hence, the Martinez chain of title has merit only insofar as possession under it ripened into a title by limitations or affords a bar to the disturbance of one claiming under it. This is a matter to be resolved later in this opinion.

As for that matter, the same might be said concerning the Lopez chain of title, save for one circumstance. It has its origin in a deed from one Juan Armijo Alferes, described as "Constitutional Alcalde", to Juan Antonio Gallegos, dated June 7, 1823. At that time New Mexico was under the sovereignty of the Republic of Mexico. We do know historically that the Constitutional Alcalde was a person of official status under Mexican rule corresponding in many respects in dignity and authority to a justice of the peace under our American system of government. See Golden v. Golden, 41 N.M. 356, 68 P. 2d 928. Neither party to this suit has seen fit to challenge the Alcalde's authority to make the deed in question for the very good reason that both claim under him and it as to the disputed area within the Sulzer Addition and the defendant as well as to the disputed area in the Viviani Addition. What the parties thus concede we shall not here question and therefore we proceed on the assumption that it is a deed issued by one in authority under the Mexican regime. So considered, it undoubtedly represents a paper title superior to that afforded by the chain originating out of the last will and testament of Telesforo Martinez resting, as the latter does, upon nothing stronger than the assumption of the testator, if it can be fairly said that the disputed area lies within the call for an eastern boundary in the Lopez chain of title.

The occasion for the proviso just mentioned arises from the fact that the two conveyances prior to the one vesting the Lopez chain of title in defendant, viz., the deed from the Constitutional Alcalde to Juan Antonio Gallegos (Abst. p. 27) and

from the latter to Nepomuseno Lopez and Maria Manuela Lopez (Abst. p. 28) describe the eastern boundary of this 125-vara strip from which the Sulzer and Viviani Additions were platted, as "the hills," whereas the deed from the Lopez heirs to defendant describe the tract conveyed as "bounded on the East by the East line of the Albuquerque Town Grant." Although the trial court found that a call "to the foothills" or "to the sandhills" as an eastern boundary in certain conveyances in the Martinez chain of title, according to general understanding among Spanish settlors, was recognized as extending to the bottom of the foothills or sandhills, the testimony supporting the finding made no attempt to explain or define the meaning of a call in a deed, "to the hills." Nevertheless, the findings, stipulations of the parties and exhibits in the case fairly establish such call as extending to the east line of the Albuquerque Land Grant and thus as embracing the lots and blocks in controversy.

The parties stipulated and the trial court found that the disputed area is located within the exterior boundaries of the Albuquerque Land Grant. The trial court also found as follows:

"3. The lots and blocks, the title to which is in dispute, lie within the exterior boundaries of three strips of land running from east to west. The southernmost of the three strips was platted as the Rodey & Bratina Addition. The middle strip, lying north of the Rodey & Bratina Addition, was platted as the Sulzer Addi-tion, and the northernmost strip lying north of and adjoining the Sulzer Addition, was platted as the Angelo Viviani Addition.

"4. The land out of which the Sulzer Addition was platted was a tract originally 62½ varas wide, and the tract out of which the Angelo Viviani Addition was platted was a tract 62½ varas wide.

"These two tracts originally composed one tract 125 varas wide, which strip of 125 varas was originally conveyed by Juan Armijo Alferes, Constitutional Alcalde, to Juan Gallegos, by deed, dated June 7, 1923. (Clerical error for 1823).

"Thereafter, said tract, 125 varas in width, was conveyed by Juan Gallegos to Juan Nepomuseno Lopez and Maria Manuela Lopez, his daughter, by deed dated April 8, 1864."

Thus, the Viviani Addition is identified as having been platted from the north 62½ vara strip, and the Sulzer Addition from the south 62½ vara strip, of the 125 vara strip conveyed by Juan Gallegos to Nepomuseno Lopez and Maria Manuela Lopez as co-tenants in a direct chain of title thereto from Juan Armijo Alferes as Constitutional Alcalde during the days of Mexican sovereignty, to-wit, June 7, 1823. Then, when we refer to plaintiff's Exhibit "J," being an original map of the City of Albuquerque, certified here for our inspection by agreement of the parties, the eastern boundary of the Sulzer and Viviani Additions is observed as coinciding with the eastern boundary of the Town

of Albuquerque Grant. It is significant, too, that in bringing the Lopez chain of title down into plaintiff as to the undivided one-half interest decreed him in the disputed area in the Sulzer Addition, the record discloses a correction deed from Nepomuseno Lopez to J. F. Sulzer, dated February 13, 1891 (Abst. p. 32) clarifying the call, "summit of the foothills," as an eastern boundary for the south 62½ vara strip in an earlier deed by grantor to one of plaintiff's predecessors in title by incorporating language definitely identifying such boundary as the eastern boundary of the Town of Albuquerque Grant.

█ Treating the Lopez chain, then, as furnishing the superior paper title, the defendant's claim to the disputed area in the Viviani Addition must be recognized as against the plaintiff claiming as to this tract under the Martinez chain alone, barring, of course, the plaintiff's claim under our limitations statutes. The abstract which is in evidence discloses paper title in Nepomuseno Lopez and Maria Manuela Lopez, his daughter, at the time of the latter's death, to the entire interest in the north 62½ varas previously conveyed to them by Juan Gallegos, grantee of the Constitutional Alcalde. Upon the death of Maria Manuela Lopez her one-half interest in the tract either descended to her heirs or vested in one Toribio Gutierrez, a grandson to whom, as defendant asserts, she devised the tract. The defendant produced in evidence a deed to it covering the north 62½ varas signed by grantors (including the purported devisee, Toribio

Gutierrez) whom the trial court on uncontroverted evidence found to be the sole surviving heirs of both Nepomuseno Lopez and Maria Manuela Lopez. The conclusion is inescapable that this deed placed in defendant the superior paper title to the disputed area in the Viviani Addition.

The question remains for determination whether the defendant has lost to plaintiff the advantage of a superior paper title by operation of the limitations statutes. We have just disposed of the Martinez title by eliminating it from consideration as did the trial court. It is under this chain that defendant claims a western boundary described in some conveyances in its chain as "to the summit of the foothills" and in others as "to the east line of High Street." Save as involved in the question of limitations or adverse possession, all conflicts and confusion arising from varying descriptions under the Martinez chain of title disappear with it.

We now turn to the plaintiff's claim of title by adverse possession and limitations. In presenting this issue, he relies upon two statutes, 1941 Comp. § 27-120, by virtue of claimed possession for ten years under color of title of lands "which have been granted by the governments of Spain, Mexico or the United States, or by whatsoever authority empowered by said governments to make grants to lands, holding or claiming the same by virtue of a deed or deeds of conveyance * * * purporting to convey an estate in fee simple." He also claims the protection of an

adverse possession under 1941 Comp. § 27-121 against defendant's assertion of title.

It was stipulated at the trial and the court found that the real estate in question is located within the Albuquerque Land Grant, confirmed to the City of Albuquerque by an act of Congress adopted February 18, 1901. Chapter 380, Vol. 31, page 796, U. S. Statutes at Large. No question is presented challenging applicability of this statute, the defendant meeting the issue squarely upon the proposition that the facts do not entitle plaintiff to relief under either statute. Since the requirements for relief under 1941 Comp. § 27-121 are more rigorous than under § 27-120, the former statute demanding proof of the concurrence of all the elements of adverse possession as there defined plus continuous payment of all taxes, etc., if plaintiff's proof fails to meet the requirements of § 27-120, it must of necessity fail under § 27-121. The trial court held such proof insufficient under both statutes. Hence we shall first test its ruling under § 27-120.

Likewise, if the plaintiff's proof cannot succeed under § 27-120 as to the disputed area within the Viviani Addition where the statute is not interposed against a co-tenant (the facts being the same as to user and occupancy), it obviously could not prevail as to the disputed area in the Sulzer Addition when invoked against a co-tenant in whose favor there exists a presumption that one co-tenant acts for the benefit of all unless there is definite proof to the contrary. Torrez v. Brady, 37 N.M. 105, 19 P.2d 183.

The area over which the dispute exists consists of rough hilly land lying in the eastern part of the City of Albuquerque out in the general vicinity of the lands of the University of New Mexico. It is cut by deep arroyos creating points of land at various places throughout the area. It was taken into the city in 1925 and, although platted into lots and blocks interspersed with streets and alleys, the rough character of the terrain apparently rendered prohibitive the cost of leveling and grading the streets and otherwise developing the property for sale as building sites. Other than as a location upon which residences or other buildings possibly could be built, the trial court found that the only beneficial uses to which any of the disputed area could reasonably be put during any of the time since either plaintiff or defendant acquired any claim of title upon it was:

"(a) In a very limited way, for grazing.

"(b) As an area from which dirt and gravel could be conveniently extracted for use in making fills and for graveling streets, roads and driveways, in and about the more thickly settled areas of the City of Albuquerque, lying within reasonable proximity to the disputed area.

"(c) For the testing of motor power and braking power of automobiles and motorcycles up and down the sharp elevations upon the disputed area.

"(d) The high points of the disputed area are so located as to constitute vantage points from which may be had a widely ex-

tended view of the City of Albuquerque and the Valley of the Rio Grande River, lying to the westward and to the north and south."

If the plaintiff ever made any use of the disputed area, the record, including his own testimony, is silent as to its nature or extent. During the period following his purchase (which was on May 10, 1919, as to the blocks in the Sulzer Addition and on August 13, 1919, as to the blocks in the Viviani Addition), the plaintiff did certain work on the property. As reflected by his testimony it consisted of the following items. About fifteen years prior to trial he drilled a water well 178 feet in depth in an arroyo near the line dividing the Sulzer and Viviani Additions, but on the latter addition, in which he installed six-inch casing and a jack and rod for pumping. At the time of installation the pipe protruded about three feet above the surface and at the time of trial about one foot. Also and about the same time, plaintiff did some grading and leveling in the vicinity of the well and elsewhere on the property. This work was done by another man and himself employing a team and scraper and continued over a period of two months, some fifteen years before the trial.

The property was used by a good many people as a dumping ground and on two or three occasions plaintiff buried trash thus dumped on the property and gathered up stones dumping them into the arroyos "so (they) would catch dirt and fill up."

He also placed at different times on the property certain painted signs reading "No dumping or hauling allowed—will be prosecuted by owner" over his name. The plaintiff admitted these signs would remain up only for a short time, being knocked down, destroyed or carried away. In addition, at some time after acquiring deeds to the property, and more than twelve years prior to the trial, the plaintiff employed surveyors, who twice set 2x2 inch wooden stakes at the corners of the blocks. More recently and within a year prior to the trial under a survey made by Edmund Ross, iron pipes were set at the corners of the blocks. The wooden stakes were knocked down or covered up within a couple of years after installation.

The plaintiff testified on cross-examination touching the nature of the property as follows:

"Q. As a matter of fact, Mr. Tietzel, at the time you acquired this land, it was lying out there in the sand hills, just as it had lain there for hundreds of years? A. To the best of my knowledge.

"Q. It had no fences on it, hadn't any buildings on it—it was just a bunch of rough sand hills, isn't that true? A. Yes."

And so far as our search of the record discloses, so it remained at the time of the trial. The property has never been fenced. There was never a building on it. The plaintiff never lived on any part of it. On the eastern blocks in the Sulzer and Viviani Addition there is a gravel formation

suited for street and highway improvement. Throughout this period it has been the custom of the public generally to go on the premises and excavate and remove the gravel without consulting the plaintiff about it. In one suit by plaintiff against the Board of County Commissioners of Bernalillo County for removing gravel, plaintiff claimed the county had removed 24,000 cubic yards of gravel in each of the years 1918, 1919 and 1920 and 21,000 cubic yards during the years 1921 and 1922, or a total of 93,000 cubic yards. Others took gravel from the area whenever they desired without plaintiff's consent and barring one or two instances, so far as the record discloses, without his protest.

On the steep slopes of some of the sand hills of the area the property was frequently used as a testing ground for automobiles and motorcycles to demonstrate hill climbing qualities. It had also been used over a considerable period in practice work by engineering students at the University of New Mexico. In fact, the record discloses that the property had been freely used by the public generally for anything for which they deemed it suitable —as a sort of commons by the people of the city. Very little of it was suitable for grazing, but occasionally stray horses were seen grazing over such of it as furnished grazing. For the past twelve years prior to the trial the plaintiff had carried on no work of any kind on the premises in the way of improvement except the Ross survey made within five or six months of the trial. The plaintiff testified:

"Q. When was the last time you did any work of any kind up there? A. About twelve years ago.

"Q. And you think that in all these years' work at different times you may have worked as many as sixty days? A. Or more.

"Q. How much more? A. I should judge at one time for about two months, started and just how much work I did then I can't say, but—

"Q. That was more than twelve years ago? A. I should say about twelve years ago.

"Q. As a matter of fact, you have had no work of any kind done on any part of the land except to erect signs for the last twelve years, have you? A. No, I guess not."

██ The trial court consistently refused to find at plaintiff's request that he was ever in the actual possession or occupancy of any part of the disputed area either in the Sulzer or Viviani Additions. We are unable to disagree with the trial court in thus refusing to find. The trial court found the facts as to plaintiff's activities in reference to the property and also as to the uses made of the property by the public generally substantially as we have related them hereinabove. Obviously the plaintiff fails to show adverse possession under § 27-121. Neither does he show that possession which is requisite under § 27-120.

Plaintiff's counsel argues strenuously that even if plaintiff has failed to establish title by adverse possession under § 27-121, which he denies, that § 27-120 is not an adverse possession statute and point to the language of the territorial court in Montoya v. Unknown Heirs of Vigil, 16 N.M. 349, 120 P. 676, 693, affirmed Montoya v. Gonzales, 232 U.S. 375, 34 S. Ct. 413, 58 L.Ed. 645, differentiating between the two statutes. The trouble with the differentiation is that it does not go far enough to aid the plaintiff. Under either statute *possession* is an essential element of proof which one claiming under it must sustain. In Montoya v. Unknown Heirs of Vigil, the case relied upon, this is made clear. The court said:

"While it may be that lapse of time may have cured defects suggested by appellants' counsel to the documentary evidence of title admitted at the trial, *the fact that no actual possession was ever established on any portion of this tract we are disposed to regard as fatal to a recovery by Gonzales of this particular tract,* and the same may be said of the Lucero y Montoya tracts covered by Exhibits 65, 65A and 65B, as no actual possession of any part of those lands was established although part of the lands were capable of cultivation. We have just sustained the possession of the interveners to the mesa lands adjoining the valley land, by reason of its use for grazing purposes, *but this was done upon the ground that by reason of actual residence, cultivation, improvements, and other visible occupancy of a part of the lands embraced in their deeds, by conclusive legal presumption this possession extended to the whole tract embraced in the conveyances.* But, even under section 2937 deeds alone are not sufficient, unaccompanied by actual occupation of at least a part of the tract, to mature a fee-simple title in 10 years. *The possession is as essential to that end as the deed, but both are necessary.* As to those tracts, there never has been actual visible possession of any part of the lands, therefore, conceding that the conveyances were valid, fee-simple title could not mature under the circumstances of this case. Bergere v. United States, 168 U.S. 66, 18 S.Ct. 4, 42 L.Ed. 383; Whitney v. United States, 167 U.S. 529, 17 S.Ct. 857, 42 L.Ed. 263." (Emphasis ours.)

See also Johnston v. City of Albuquerque, 12 N.M. 20, 72 P. 9; Montoya v. Catron, 22 N.M. 570, 166 P. 909; First National Bank v. Town of Tome, 23 N.M. 255, 167 P. 733; Hoskins v. Talley, 29 N.M. 173, 220 P. 1007; Merrifield v. Buckner, 41 N.M. 442, 70 P.2d 896.

Plaintiff also cites the doctrine enunciated in many cases that where the rightful owner is in actual occupancy of a part of the land described in his deed and there is no mixed possession as to the remainder, his possession will be deemed coextensive with the calls in his deed. Montoya v. Unknown Heirs of Vigil, supra. Here, too, does the plaintiff fall short in his proof in that he failed to show himself in actual possession of any part of the disputed area.

It follows from what has been said that the decree of the trial court is correct and should be affirmed.

It is so ordered.

BICKLEY, BRICE, and THREET, JJ., concur.

MABRY, J., having presided at the first trial of this cause, did not participate.